# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

FREDERICK McMILLIAN,

Plaintiff,

vs.                                                    9:13-CV-1124
                                                       (TJM/ATB)

THE COUNTY OF ONONDAGA, et al.,

Defendants.

FREDERICK McMILLIAN, Plaintiff pro se
CAROL L. RHINEHART, Asst. County Atty

## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge. In this amended civil rights complaint, plaintiff alleges that his constitutional rights were violated when he was incarcerated as a pretrial detainee at the Onondaga County Justice Center ("OCJC") from July 16, 2011 until January 26, 2012. (Amended Complaint ("AC") ¶ 6A) (Dkt. No. 20).

Presently before the court is a motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by defendants Onondaga County and Richard Carbery, Chief Administrator.[1] (Dkt. No. 36, 37).[2] Plaintiff has responded in opposition to the motion.

---

[1] On May 14, 2014, Judge McAvoy allowed plaintiff to file an amended complaint and dismissed all defendants except Onondaga County; Richard Carbery; and Leah LaMere (a mental health social worker). (Dkt. No. 19). As a result, plaintiff's Sixth and Seventh Causes of Action were also dismissed. Even though the Amended Complaint still contains the dismissed defendants and the dismissed causes of action, this court will address only the remaining issues and defendants. In his second response to the defendants' motion, plaintiff recognizes that there are only three remaining

(Dkt. Nos. 48, 51). In his second submission, plaintiff has requested additional discovery pursuant to Fed. R. Civ. P. 56(d)(2) and "sanctions based on violations of local R. 7.1/8.1."[3] (Dkt. No. 51).

## I. Facts and Contentions

### A. Suicide Watch

Plaintiff alleges that at approximately 9:48 p.m. on July 16, 2011, following his admission to the OCJS, he met with defendant LaMere, a Behavioral Health Services Social Worker. (AC at 6). Defendant LaMere performed an "intake assessment." (AC at 7). During this assessment, defendant LaMere asked plaintiff if he "had any thoughts of suicide" or "of hurting himself." (*Id.*) Plaintiff claims he told defendant LaMere that, although he was "a little depressed about his current situation, he was not suicidal," nor did he have thoughts of hurting himself or anyone else. (*Id.*) Plaintiff alleges that as the

---

defendants and five causes of action. (Dkt. No. 51 at 1). Finally, notwithstanding the substitution of Leah LaMere for a "Jane Doe" defendant, Ms. LaMere has not been served. On June 6, 2014, the court received a notice from the Onondaga County Sheriff's Department that Leah LaMere no longer worked at the OCJC. (Dkt. No. 26). On June 11, 2014, a summons for Leah LaMere was reissued (Dkt. No. 28), and service was re-attempted. However, on June 18, 2014, the summons was returned "unexecuted." (Dkt. No. 29). Plaintiff wrote two subsequent letters to the court requesting further attempts to serve Ms. LaMere. (Dkt. Nos. 30, 41). On June 17, 2014, the summons and complaint were "mailed to E/Pa for personal service" at an address in Pennsylvania, but on August 28, 2014, the summons was returned "unexecuted" with a note, dated June 26, 2014, stating that Ms. LaMere is no longer employed by Correctional Medical Care ("CHC") in Pennsylvania. Plaintiff has not requested further service on this defendant.

[2] Dkt. No. 37 and 37-1 are plaintiff's medical records that defendants have filed in support of their summary judgment motion.

[3] Plaintiff's request for sanctions is based upon defense counsel's filing of plaintiff's medical records. (Dkt. No. 37). Plaintiff has already complained about the defendants' conduct, and this court addressed the issue in a lengthy text order, denying plaintiff's motion to delete or redact the records. (Dkt. No. 42). Based upon this court's text order, plaintiff's request for sanctions relative to defense counsel's filing these documents is denied.

interview continued, defendant LaMere repeatedly stopped or interrupted plaintiff and was more interested in flirting with a corrections officer than with interviewing plaintiff.

Plaintiff claims that he became quite frustrated at defendant LaMere's conduct and asked to speak with someone else. Defendant LaMere allegedly raised her voice, told plaintiff that there was no one else with whom he could speak, and threatened plaintiff that if he did not answer her questions, he would be "end up on 5C, One on One." (*Id.*) Plaintiff states that he was unaware of what defendant LaMere meant at that time, and he did not wish to argue with her, so he just said "whatever." At that point, plaintiff claims that defendant LaMere stood up, said that she was "done," and told the officer that plaintiff was going upstairs "One on One." Plaintiff was then escorted up to the 5C housing "pod" and placed in an observation cell.

Plaintiff claims that the decision to put him on "One on One" ("1-1") supervision[4] was "retaliatory" in response to his "voiced concerns" about defendant LaMere's behavior. (AC at 7-8). Plaintiff states that he did not make any suicidal statements, and nothing he said during the interview could have been interpreted as such. Plaintiff claims that he later learned that the OCJS staff often place detainees who they perceive to be "uncooperative" on "One on One" as a punitive measure and to "make them subservient." Plaintiff states that the conditions of that confinement are harsh, and the confinement may not be challenged through the procedures used for

---

[4] One-on-One Supervision is also known as "Constant Supervision" as defined in New York Code of Rules and Regs. ("NYCRR") tit. 9, § 7003.2(d). The term has also been referred to as "Suicide Watch." This court will refer to plaintiff's status as "1-1 supervision."

"normal" disciplinary proceedings. (*Id.*)

Plaintiff states that the observation cell was extremely cold, and he was forced to surrender all of his clothes. He was given only a "wrap around" that was extremely uncomfortable, often fell off, and did not fully cover plaintiff's genital area or buttocks when he slept, sat down, or used the toilet. (*Id.*) Plaintiff states that he was forced to sleep on a cold steel slab on the floor, without a mattress, blanket, or pillow, which caused bruising of his hips and lower back pain. Plaintiff also states that because his feet were bare, he got a pencil lead stuck in his toe that became infected, and he had to "endure" four days of pain before the medical unit finally decided to remove it. (*Id.* at 9). Plaintiff states that he was only allowed one shower the "entire week." Plaintiff claims that there was an officer posted outside his cell door 24 hours per day, and that the observation cell was located in the middle of the housing pod, where plaintiff could be seen by other inmates, security staff, and male and female civilians while he was sleeping, sitting down, or using the toilet. (*Id.* at 9).

Finally, plaintiff claims that any conversations with his attorney, mental health, and medical staff were "made public" because he had to speak with these individuals through his cell door, despite the fact that interview rooms were available on the unit. (AC at 9-10). Plaintiff claims that the corrections officers would often joke or make fun of the detainees based upon the confidential information that the officers overheard. Plaintiff claims that his dignity, privacy, and confidentiality were "violated" based upon these conditions of confinement and that the County could have achieved its goal of preventing an inmate from committing suicide by "far less degrading, harsh, or

4

humiliating ways." (*Id.* at 10).

**B.    Telephone Charges/Writing Instruments & Stamps/Money Order Policies**

Plaintiff alleges that the OCJC policy of allowing inmates only local calls at the County's expense at the time of booking violates plaintiff's First Amendment constitutional right to communicate with his family and his New York State Statutory right under N.Y. Crim. Proc. Law § 180.10, which requires the County to allow communications "free of charge" for purposes of locating counsel.[5]  Plaintiff also alleges that the OCJC had an "unreasonable phone contract" which resulted in "extremely high pre-paid & collect call rates, that were way above average for the purpose of exploiting pre-trial detainees for financial gain." (AC at 5).  Plaintiff claims that these costs made it unreasonably expensive for his family to communicate with him in violation of his First Amendment rights.

Plaintiff claims that the OCJC unnecessarily refused to accept money orders and required an inmate's family and friends to use a "money deposit machine" to place money into an inmate's account. (AC at 5).  Plaintiff states that on July 25, 2011, the OCJC refused to process a money order sent by his sister, requiring plaintiff to spend additional time to obtain the funds, "forc[ing] indigency upon the Plaintiff unnecessarily." (*Id.*)  Plaintiff alleges that when he was arrested, he had a dollar in his

---

[5] N.Y. Crim. Proc. Law § 180.10(3) provides that a defendant has a right to counsel at arraignment and at every subsequent stage of the criminal action.  If he appears at arraignment without counsel, he has the right, inter alia, "to communicate, free of charge, by letter or by telephone provided by the law enforcement facility where the defendant is held to a phone number located in the United States or Puerto Rico, for the purpose of obtaining counsel and informing a relative or friend that he or she has been charged with an offense." *Id.* § 180.10(3)(b).

possession, but the OCJC "refused to credit his account" with the money and placed it in his property "where Plaintiff could not use it" to purchase writing utensils and stamps.

Plaintiff raises the following remaining claims:

(1)     Based upon the failure to allow plaintiff to communicate with his family, friends and counsel, defendants OCJC and Carbery violated plaintiff's rights to free speech (1st Amendment) and due process (14th Amendment) as well as the New York State Constitution. (AC at 13). (First Cause of Action).

(2)     Defendant LaMere retaliated against plaintiff based upon his criticism of her behavior and professionalism, by placing plaintiff on a One-on-One watch in the Behavioral Unit. Plaintiff claims that this action violated his right to be free from "cruel and unusual punishment," his right to free speech, and his right to due process in addition to various provisions of the New York State Constitution. (AC at 13) (Second Cause of Action).

(3)     The conditions experienced by plaintiff during his One-on-One observation were "humiliating, unnecessary, uncivilized, degrading, and tantamount to punishment" in violation of his rights to due process and to be free from cruel and unusual punishment. (AC at 14, 15) (Third and Fifth Causes of Action).

(4)     While confined in One-on-One observation, plaintiff alleges that he was unable to speak privately with his attorney or with mental and medical health personnel in violation of plaintiff's right to due process, privacy, and equal protection. (AC at 14) (Fourth Cause of Action).

Plaintiff has requested declaratory and monetary relief. In his response to defendants' motion, plaintiff has filed affidavits from other inmates who are familiar with 1-1 supervision. (Dkt. No. 48-1-48-4).

Defendants have filed a substantial number of exhibits, including plaintiff's medical records and the affidavits of defendant Carbery and Assistant Attorney General

Rhinehart. (Dkt. No. 36-1-36-20). Rather than detail all the defendants' facts at the outset, I will discuss the evidence as I analyze the issues presented by defendants' motion.

## II.  Summary Judgment

### A.  General Legal Standards

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining

whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## B. Standard for Continuance

In this case, in his opposition to defendants' motion, plaintiff has requested additional discovery pursuant to Fed. R. Civ. P. 56(d). (Dkt. No. 51) (Pl.'s Opp. Br. at 15).[6] Pursuant to Rule 56(d), the non-moving party may argue that additional discovery is necessary so that he may properly respond to the summary judgment motion. To properly make this argument, the non-movant must file an affidavit explaining what facts are sought; how they will be obtained; how these facts are reasonably expected to create a genuine issue of material fact; what efforts the party has made to obtain the facts; and why those efforts have not been successful. *Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 422 (2d Cir. 1989) (discussing prior version of the rule which was Fed. R. Civ. P. 56(f)); *Douglas v. Hale*, No. 12-CV-1112, 2015 WL 471135, at *4 (W.D.N.Y. Jan. 15, 2015) (citations omitted).

The party opposing summary judgment is not automatically entitled to additional discovery. *Id.* However, if the non-moving parting makes the required showing, the court may deny the motion or defer the motion, while allowing additional time to obtain the discovery. Fed. R. Civ. P. 56(d)(1), (d)(2).

---

[6] Plaintiff has numbered the pages at the bottom of his opposition brief, and the court will cite to the pages as numbered by plaintiff. Other documents that have been filed in this action may not be separately paginated, and the court will cite to the page number designated across the top of the page by the court's electronic filing system ("CM/ECF").

## C.     Application

Plaintiff alleges that he needs a "continuance" because he believes that he needs "[additional] discovery of the Minimum standards, regulations & procedures set by the State Commission of Corrections regarding suicide watches . . . ." (Pl.'s Opp. Br. at 15). Plaintiff claims that he has not been able to obtain these "standards," and he believes that these standards will assist him in raising a genuine issue of material fact regarding whether the defendants were "authorized or in compliance with minimum standards set by the commission." (*Id.*)  Plaintiff also claims that he needs additional discovery in order to determine the "commission rates" under the contract with the County's telephone provider. (Pl.'s Opp. Br. at 10).  Finally, plaintiff claims that he is waiting for a response from his former attorney, who was asked whether attorneys were informed by the defendant County of the possibility of a private interview with their clients on 1-1 supervision. (Pl.'s Opp. Br. at 19).

### 1.     Minimum Standards

The court would first point out that the Commission's "minimum standards" relate to the operation of "Local Correctional Facilities" in general and are codified in the Title 9, Subtitle AA, Ch. I of the New York Code of Rules and Regulations.  There is no separate section for "Suicide Watch," and the relevant sections which apply to "constant supervision" have been supplied to plaintiff as exhibits by defendants.  These standards appear in Part 7003, which is entitled "Security and Supervision."  Defendants have supplied various Directives which contain quotations from the Minimum Standards.

The definition of "Constant Supervision" or "Constant Observation" is contained in defendants' Ex. H (Onondaga County Sheriff's Office ("OCSO") Post Order for Constant Observation Deputy) (citing 9 NYCRR § 7003.2(d) (Dkt. No. 36-14). This Directive also contains a description of the Suicide Prevention Program. (Def.s' Ex. H "Mental Health Services Directive, CUS-051(VI) (Dkt. No. 36-13). Plaintiff has also been supplied with the "Policy Addressing Suicide Prevention" from Correctional Medical Care, Inc., followed by the health care professionals at OCJC. (Def.s' Ex. F). Thus, plaintiff has not shown that he needs further discovery with respect to "Minimum Standards" to properly respond to the motion. All of the documents relating to plaintiff's suicide watch have been supplied by the defendants as exhibits.

## 2.    Telephone Contract

As discussed below, this court finds that notwithstanding the provisions of a contract with the County's telephone provider, plaintiff has no constitutional right to demand a particular telephone rate from the defendant. Thus, no additional discovery is necessary regarding the "commission rates imposed."

## 3.    Letter from Plaintiff's Former Attorney

Plaintiff also asks for a continuance so that he may obtain a "waited response"[7] from his former attorney regarding whether he was told that he could request a private interview with plaintiff while he was on 1-1 supervision. The court notes that plaintiff's response to the summary judgment motion was dated October 1, 2014 and

---

[7] Plaintiff had already written to his former attorney when he filed his brief at the beginning of October 2014.

was amended on October 16, 2014. (Dkt. Nos. 51, 52). It is now several months later, and plaintiff has failed to submit any letter from counsel.[8] The submission of the evidence was under plaintiff's control. This court will not grant a continuance for further submissions, and finds that even if plaintiff's attorney was not told about the possibility for a private room, no material question of fact will be raised, and plaintiff's claim must still be dismissed. Thus, a continuance for further discovery is denied, and the court will proceed to consider defendants' motion for summary judgment.[9]

## III. Municipal Liability

### A. Legal Standards

The standard for municipal liability requires that the municipality adopt a "custom" or "policy" which is the moving force behind plaintiff's constitutional violation. *Zappala v. Albicelli*, 980 F. Supp. 635, 639 (N.D.N.Y. 1997) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 659 (1978)). A municipality may not be held liable on the basis of respondeat superior alone, and a single incident alleged in a complaint, particularly if it involves only actors below the policymaking level, will not suffice to raise an inference of the existence of a custom or policy. *Id.* (citing *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). In addition, plaintiff may not simply allege that there was a failure to train municipal

---

[8] On January 7, 2015, plaintiff requested that the demand listed on the docket sheet be modified. (Dkt. No. 54). I granted plaintiff's request on January 12, 2015. Plaintiff did not mention that he had received a letter from counsel that he wished to have the court consider.

[9] The court notes that the defendants have filed a substantial number of exhibits, covering the procedures that are followed relating to all the claims made by plaintiff, including his telephone and money order claims.

employees or assert in a conclusory manner that the municipality has a custom or policy. *Id.*

## B. Application

The remaining defendants are Onondaga County and Richard Carbery, Chief Administrator of the OCJC. To the extent that plaintiff names the County itself and defendant Carbery in his "official" capacity, plaintiff must establish municipal liability. Plaintiff's retaliation claim, asserted against individual defendant LaMere complains of an isolated incident in which he alleges that, based upon his criticism of LaMere's behavior, she improperly placed plaintiff in 1-1 watch. This allegation is clearly a "single incident" by an individual who was not a policy-maker.[10] Therefore, any retaliation claim may not be asserted against Onondaga County or defendant Carbery in his official capacity.

If plaintiff is attempting to bring the retaliation claim against defendant Carbery in his "individual capacity, plaintiff must show that this supervisory defendant was "personally involved" in the constitutional violation. For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell*, 9:04-CV-724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*,

---

[10] In fact, defendant LaMere did not even work for the County at the time that the incident occurred. She worked for Correctional Medical Care, Inc. ("CMC"), a company which contracted with Onondaga County to provide medical/mental health care to inmates. (Carbery Aff. ¶¶ 13, 20).

21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability: (1) if the supervisor directly participated in the infraction; (2) if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong; (3) if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (4) if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id.*

Based on the facts as stated by plaintiff, there is no claim that defendant Carbery was aware of the alleged retaliation, and because defendant LaMere did not work for the County, defendant Carbery's personal involvement could not be found based upon his gross negligence in managing his subordinates. There was no "policy" alleged in this portion of the complaint, and there is no indication that defendant Carbery became aware of the alleged violation prior to plaintiff's release from 1-1 watch. Plaintiff does not make any such allegation. The retaliation claim may thus be dismissed as against Onondaga County and as against defendant Carbery, both in his individual and his official capacity.

With respect to the plaintiff's other claims, the court will proceed to consider the merits. It is conceivable that the conditions of confinement under 1-1 supervision and the telephone restrictions could be considered a "policy" of the County. However, both

claims fail on the merits.

## IV. <u>Communication and Telephone Policy</u>

### A. **Legal Standards**

A prison inmate's right to communicate with his family and friends is protected by the First and Fourteenth Amendments. *Pitsley v. Ricks*, No. 96–CV–0372, 2000 WL 362023, at *4 (N.D.N.Y. Mar. 31, 2000)). However, inmates have no constitutional right to unrestricted telephone use.[11] *Riddick v. Arnone*, No. 3:11-CV-631, 2012 WL 2716335, at *6 (D. Conn. July 9, 2012) (citing *Henry v. Davis*, No. 10 Civ. 7575(PAC)(JLC), 2011 WL 5006831, at *2 (S.D.N.Y. Oct. 20, 2011); *Pitsley v. Ricks*, No. 96–CV–0372, *supra*). *See also Walton v. New York State Dep't of Corr. Svcs.*, 13 N.Y. 3d 475, 492 (2009) ("Virtually every court to have addressed this issue has held that there is no constitutionally guaranteed right of inmates to use a telephone.")

In *Pitsley*, the court held that "'[t]he exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions.'" *Pitsley, supra* (quoting *Fillmore v. Ordonez*, 829 F. Supp. 1544, 1563–64 (D. Kan. 1993), *aff'd*, 17 F.3d 1436 (10th Cir. 1994)). Generally, prison regulations imposing telephone restrictions have been upheld. *Id.* at 5. In situations where the restrictions have been upheld, the inmate had

---

[11] Judge McAvoy's first order in this case dismissed this claim as against the Town of DeWitt because plaintiff alleged that he was not allowed to make a free telephone call at the time of his arraignment. Judge McAvoy cited many of the same cases that I cite in this opinion. When plaintiff amended his complaint, he elaborated on some of these same claims, and I allowed the amendment based on the liberality with which pro se complaints are treated. (Dkt. No. 19 at 4-5). However, based upon the evidence submitted by defendants in their summary judgment motion, I have come to the same conclusion as Judge McAvoy regarding the First Amendment communication claims.

alternate means of communicating with the outside world, "most often by use of the mail." *Id.* (citation omitted).

## B.    Application

Plaintiff alleges that he was not allowed to make a free long distance telephone call upon his incarceration at the OCJC.[12] (AC ¶ 6A(i)).  Plaintiff states that "alternative means were not offered to effectuate that right. . . ." (*Id.*)  He concedes that inmates are afforded the opportunity to make local calls, but plaintiff's family lives outside of Onondaga County. (*Id.*)  Plaintiff also alleges that the OCJC's contract for telephone services is "unreasonable" and imposes too high a cost on the inmates and their families who must use those services. (AC ¶ 6A(v)).

As Judge McAvoy recognized, an inmate has no constitutional right to use the telephone, and the fact that plaintiff also bases his right on New York Crim. Proc. Law § 180.10(3), does not change the constitutional analysis.  It is well-settled that the violation of a state statute does not automatically rise to the level of a constitutional violation. *Dixon v. Goord*, 224 F. Supp. 2d 739, 744-45 (S.D.N.Y. 2002).  Thus, even if section 180.10(3) was violated by defendants, this would not rise to the level of a constitutional violation.  In any event, section 180.10(3), by its own terms does not grant a defendant the right to use the "telephone."  The statute specifically states that if the defendant appears at arraignment without counsel, he or she has the right to communicate ***by letter or by telephone*** for purpose of obtaining counsel and informing

---

[12] As stated above, plaintiff originally made this claim against the Town of DeWitt, and Judge McAvoy dismissed this claim. (Dkt. No. 5 at 9).

a relative or friend that he or she has been charged with an offense. The statute emphasizes that if the defendant is allowed to use the telephone, the call must be within the United States or Puerto Rico.

Defendant Carbery states in his affidavit that the open waiting area in "Booking" and all of the housing pods have telephones that the inmates may use to make ***collect*** calls. (Carbery Aff. ¶ 11). Upon admission to the facility, each inmate is permitted to make a local telephone call at OCJC expense. (*Id.*) Defendant Carbery also states that the OCJC has an inmate commissary, stocked with legal supplies, health and beauty aids, dry goods, food items, and some non-prescription medications that may be purchased by inmates. (Carbery Aff. ¶ 28). "Inmates without money may qualify for indigent supplies." (*Id.*) The OCJC Written Directive, entitled Inmate Commissary provides that indigent inmates shall be provided at OCJC expense, with "supplies necessary for the preparation of legal matters, including pens or pencils, paper, and two prepaid envelopes." (Carbery Aff. Ex. J, Directive CUS-034(IV)(E)) (Dkt. No. 36-16). Indigent inmates are also provided personal care items, including "but not limited to" soap; toothbrushes; toothpaste; comb; and some over-the-counter medications. (*Id.*)

Plaintiff appears to concede that he ultimately received the "indigent materials," but states that he had to wait ten days before being provided these items.[13] (AC ¶ 6(A)).

---

[13] Plaintiff's records indicate that he received his first "indigent pack" on July 24, 2011, only eight days after his admission and only two days after his release from BHU. (Dkt. No. 36-6 at 27). The indigent pack contained a pencil, soap, shampoo, deodorant, toothpaste, and paper. (*Id.* at 33). He received another "indigent pack" on August 3, and another on August 13, 2011. (*Id.*) On August 19, 2011, he made substantial purchases from the commissary, including various food items, a legal pad, envelopes, stamps, and a pen. (*Id.*)

Plaintiff was on 1-1 supervision for the first six days of his incarceration at OCJC, and he was not allowed to have the pens and pencils due to the restriction of "no sharps." Defendant Carbery states that inmates could make collect long distance calls. (Carbery Aff. ¶ 11). Although plaintiff claims that he was not allowed to make a long distance call at OCJC expense, there is no indication that he was not allowed to make a collect call to family members who lived outside Onondaga County. Even if plaintiff were not allowed to make a call, notwithstanding a policy to allow such calls, then the County would not be liable based on a the conduct of a non-defendant who did not allow plaintiff to make the call. Defendant Carbery would not have personally responsible for the failure of an unknown individual to follow the County's policy.[14] The restriction that free calls must be local is not unreasonable, given that inmates are allowed to make collect telephone calls to individuals who live outside of the County.

Plaintiff also challenges the contract that the OCJC has with its telephone provider. Plaintiff states that his sister was forced to pay too much for one hour of telephone time. (AC ¶ 6A(v)). In *Walton v. New York State Dep't of Correct. Svcs.*, the plaintiffs were two legal service providers, representing inmates and the recipients of the inmates' collect telephone calls. 13 N.Y. at 482. The plaintiffs challenged the contract that the Department of Correctional Services ("DOCS")[15] had with its telephone provider whereby the provider would charge a fee, from which DOCS would

---

[14] The court also notes that clearly plaintiff was able to contact and see his attorney while he was in 1-1 supervision because the log book shows a visit from counsel.

[15] DOCS is now known as the Department of Corrections and Community Supervision ("DOCCS"), but the court will refer to the defendant in *Walton* as DOCS.

collect a "per call commission" which was deposited into an account for the benefit of the inmates and the facility.[16] *Id.* The plaintiffs/petitioners challenged the contract on various bases. *Id.* The court ultimately held that the policy did not violate the New York State Constitution. *Id.* at 490-92. The court stated that while inmates

> unquestionably have a constitutional right to communicate with the outside world in a manner and to an extent consistent with their incarcerative status, petitioners point to no persuasive authority for the proposition that this equates to a right to use a specific means for such communication – the telephone – much less to guarantee telephone service at a particular cost."

*Id.* at 491.

In *Holloway v. Magness*, No. 5:07-CV-88, 2011 WL 204891 (E.D. Ark. Jan. 21, 2011), the court came to the same conclusion as the court in *Walton*, dismissing a claim in which plaintiff inmates were challenging "the economic arrangements by which telephone services are made available to them." *Id.* at *1. In doing so, the court cited to many cases in which similar policies were upheld. The court stated that "no court has yet held, on any [of the legal theories proposed] that a contract between a telephone company and a prison system was unlawful." *Id.* at *4. The court in *Hollaway* pointed to only two cases in which motions to dismiss were denied, while finding that plaintiffs might be able to prevail if they could show that the costs were so exorbitant that they were unable to communicate. *Id.* & n.22 (citing *Byrd v. Goord*, No. 00 Civ. 2135, 2005 WL 2086321, at *8 (S.D.N.Y. Aug. 29, 2005); *McGuire v. Ameritch Svcs., Inc.*, 253 F.

---

[16] The court in *Walton* noted that as of 2008, DOCS was directed to discontinue the policy of collecting commissions on inmate calls. 13 N.Y.3d at 483.

Supp. 2d 988 (S.D. Ohio 2003). *Byrd* was later dismissed as moot after the enactment of N.Y. Correct Law § 623 which removed the commission policy for New York State facilities. *See Byrd v. Goord*, No. 00 Civ. 2135, 2007 WL 2789505 (S.D.N.Y. Sept. 26, 2007).

In this case, defendant Carbery has filed the County's policy regarding commissions on telephone calls. (Def.s' Ex. N). Plaintiff has not shown that this policy prevented all communication since he admits that he spoke at length to his sister, but that the telephone call was expensive and could have been less expensive if the contract had been more reasonable. Based upon the case law cited above, plaintiff has failed to establish that he has a constitutional right to a particular fee for telephone calls. There is also no basis for plaintiff's conclusory allegation that the "extremely high pre-paid & collect call rates" . . . were imposed for the purpose of "exploiting pre-trial detainees for financial gain." (AC ¶ 6A(v)). Conclusory allegations are insufficient to state constitutional claims. *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987). Thus, plaintiff's telephone claim may be dismissed.

## V.   <u>Money Order Policy</u>

Plaintiff also alleges that the OCJC refuses to accept money orders and requires the inmates families to use a money deposit machine at the jail, which involves "additional fees." (AC ¶ 6A(iii)). Plaintiff essentially alleges that he had to wait a long time for his sister's money order to be processed. It is unclear what constitutional right plaintiff is asserting in this claim. He states that indigency was "forced" upon plaintiff. However, as stated above, when plaintiff did not have funds, he was given an "indigent

pack," which contained both personal hygiene items as well as writing materials. Plaintiff has not shown that communication was eliminated for him based on the delay in processing the money order, and plaintiff's claim may be dismissed. Plaintiff includes a claim that the OCJC refused to credit *one dollar* to his account when he was arrested, and instead placed it in plaintiff's personal property so he could not use it to purchase stamps or pens. This claim may be dismissed because plaintiff has shown no constitutional right that could have been violated by such action.

## VI. 1-1 Supervision (Suicide Watch)

### A. Retaliation (Defendant LaMere)

#### 1. Legal Standards

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.* Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n. 21

(S.D.N.Y. 2011) (collecting cases).

To establish retaliation, the plaintiff must also demonstrate a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). Although a "'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp. 2d at 370 (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id*. at 371. "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the

suspension of disbelief necessary to credit the allegations made in the complaint.'"

*Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.11

(N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55

(2d Cir. 2005)).  To be sufficient to create a "factual issue," in the context of a summary

judgment motion, an allegation in an affidavit or verified complaint "must, among other

things, be based 'on personal knowledge.'"  *Id.,* 2006 WL 1133247, at *3 & n.7

(collecting cases); Fed. R. Civ. P. 56(c)(4).

## 2.    Application

Plaintiff claims that defendant LaMere placed plaintiff on 1-1 supervison because

he complained to her about her behavior during their initial interview and requested to

speak with another individual.  There is support for the proposition that an inmate's

verbal complaints might serve as the basis for a section 1983 retaliation claim. *Ahlers v.*

*Nowicki*, No. 9:12-CV-539, 2014 WL 1056935, at *3 & n.1 (N.D.N.Y. Mar. 18, 2014)

(citing *Monko v. Cusack*, No. 9:11-CV-1218, 2013 WL 5441724, at *10 (N.D.N.Y.

Sept. 2013) (citing *Smith v. Woods*, No. 9:03-CV-480, 2006 WL 1133247, at *10

(N.D.N.Y. April 24, 2006), *aff'd* 219 F. App'x 110 (2d Cir. 2007); *Brewer v. Kamas*,

533 F. Supp. 2d 318, 328 (W.D.N.Y. 2008)).  Thus, the court will assume that plaintiff

could sustain a claim for retaliation based solely upon his verbal complaints to

defendant LaMere.[17]  This court finds, based upon the records that plaintiff did make a

---

[17] Defendant LaMere is not a party to this action because she has not been served and has not joined in the motion for summary judgment.  The federal rules provide that if a defendant is not served within 120 days after the complaint is filed, the court may dismiss the action without prejudice after notice to the plaintiff.  Fed. R. Civ. P. 4(m).  After several attempts in this case, no one has been able to find defendant LaMere to serve her with the summons and amended complaint.  Thus, the court would

suicidal statement, and plaintiff would have been placed on 1-1 supervision even if defendant LaMere were angry with him for refusing to answer her questions.

Plaintiff claims that he never made a suicidal statement to defendant LaMere and that she only placed him on 1-1 supervision because he refused to answer her questions when he became frustrated with her behavior during the interview and requested to speak with another social worker. The medical records contain the detailed entries that are kept when an individual is placed on constant supervision. Plaintiff was "booked" into the OCJC at 8:20 p.m. (20:20) on July 16, 2011. (Dkt. No. 37-1). The "triage" documents, which appear to be signed by defendant LaMere, indicate that plaintiff appeared under the influence of drugs and made "suicidal statements." (*Id.* at 2). Her recommendation was that plaintiff be placed on "constant observation" (1-1) in the Behavioral Health Unit ("BHU"), with a "psych referral." (*Id.*)

On July 17, 2011, plaintiff was evaluated in the BHU. (Dkt. No. 37 at 62-67). The evaluation, which does not appear to be written by defendant LaMere, contains the quote: "doesn't feel like being alive." (*Id.* at 65). The report also indicates that plaintiff had a history of cutting himself and "mentioned biting." (*Id.*) Plaintiff also told the evaluator that he had used alcohol and crack cocaine just before his arrest. (*Id.*

---

generally recommend dismissal without prejudice as to this defendant after notifying plaintiff that the dismissal was unavoidable unless he could locate the defendant for service. At this point, it appears that the defendant is no longer in New York State and no longer works for the entity for which she worked in Pennsylvania. Thus, the chance of locating this individual for service are very slim. In addition, the medical evidence submitted by the County defendants establishes that plaintiff cannot establish a retaliation claim against this defendant because plaintiff would have been placed on 1-1 supervision, notwithstanding any claims of retaliation by defendant LaMere. Thus, this court will consider the merits of plaintiff's retaliation claim.

at 64). The progress notes accompanying the evaluation are consistent with these statements and indicate that plaintiff would remain in constant supervision due to being "actively suicidal." (*Id.* at 29).

Progress notes dated July 21, 2011, not written by defendant LaMere, state that plaintiff "[r]eported that he was coming off of drugs **when he made statements of self harm**." (*Id.* at 27) (emphasis added). Thus, on July 21, 2011, plaintiff admitted that he made statements of self-harm, which would justify placing plaintiff on 1-1 supervision. On July 21, 2011, he denied having any further suicidal ideation. (*Id.*) Plaintiff's later statements show that regardless of any argument he may have had with defendant LaMere, plaintiff later admitted that he made statements that justified his referral to BHU on 1-1 supervision. Thus, plaintiff could not sustain a claim for retaliation as against defendant LaMere. *See, e.g., Quick v. Graham*, No. 9:12-CV-1717 (DNH/ATB), 2014 WL 4627108, at *12 & n. 16 (N.D.N.Y. Sept. 11, 2014) (plaintiff's apparent denial, in his motion response, that he was on suicide watch did not create an issue of fact sufficient to overcome a summary judgment motion, given the prison's written logs documenting that plaintiff was on suicide watch during the relevant time period and plaintiff's prior admission to that effect in the complaint) (citing, *inter alia*, *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.")).

## B. Conditions of 1-1 Confinement

Plaintiff makes a variety of claims relating to his 1-1 confinement. Some claims

involve the actual conditions of the cell and medical care (temperature, metal "slab" for a bed; splinter in foot); some claims involve his right to privacy (inadequate clothing, privacy in personal hygiene); some claims involve the "First Amendment" (communication with outside individuals, telephone privileges); and some involve privacy in communications with attorneys and doctors. The court will address the individual claims as well as any argument that the combination of conditions may have resulted a constitutional violation.

### 1. Legal Standards

#### a. Cell Conditions

Plaintiff was a pretrial detainee at the time of the incidents that plaintiff challenges in this case. As such, he was protected from unconstitutional living conditions by the Due Process Clause of the Fourteenth Amendment; but the standards for his due process protection are the same as those that protect convicted inmates from Cruel and Unusual Punishment under the Eighth Amendment. *Liggins v. Griffo*, 356 F. App'x 537, 539 (2d Cir. 2009) (citing *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009)); *LaRock v. Amato*, No. 9:12-CV-503, 2013 WL 5466410, at *9 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive

risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 199) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard

an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*. "A risk can be so obvious that a jury may reasonably infer actual knowledge of the defendant[] sufficient to satisfy the subjective component of the deliberate indifference standard. *Hall v. Bennett*, 379 F.3d at 464 (citing *Farmer*, 511 U.S. at 842; *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997)). "Common sense" is relevant to deciding the obviousness of the risk. *Fruit v. Norris*, 905 F.2d 1147, 1150-51 (8th Cir. 1990).

## b.    Bodily Privacy

Shielding one's unclothed figure from the view of strangers is "impelled by elementary self-respect an personal dignity." *Jean Laurent v. Lawrence*, No. 12 Civ. 1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar. 19, 2013) (citing *Michenfeler v. Sumner*, 860 F.2d 328, 333-34 (9th Cir. 1988)). However, while an inmate's right to privacy does not vanish altogether when he is imprisoned, that right must yield to a penal institution's need to maintain security. *Id.* (citing *Cumbey v. Meachum*, 684 F2d 712, 714 (10th Cir. 1982).

In *Jean Laurent*, the court noted that "'recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex' – which would include possible glimpses on the way to the shower – 'may be permissible.'" *Id.* (citing *Correction Officers Benev. Ass'n of Rockland Cnty. v. Kralk*, No. 04 Civ. 2199(PG), 2011 WL 1236135, at *11 (S.D.N.Y. Mar. 30, 2011) (citations omitted); *Israel v. City of New*

*York*, No. 11 Civ. 7726(JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012) (finding intake strip searches permissible, notwithstanding the presence of other inmates and officers, males and females); *Baker v. Welch*, No. 03 Civ. 2267(JSR)(AJP), 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) (stating that a balance should be struck, which would allow occasional viewing but that would prohibit regular viewing); *Miles v. Bell*, 621 F. Supp. 51, 67 (D. Conn. 1985) (explaining that cases finding a violation of privacy rights have looked to the frequency or regularity of such viewing, and finding violations only in those cases in which the guards "regularly" watch inmates undressing, using toilet facilities, or showering). The right of privacy recognized by the Constitution also protects against the disclosure of personal matters, including medical records and information. *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977); *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994).

### c.    First Amendment

The First Amendment protects the right to share information and ideas, including conversation among family members. *Sparks v. Seltzer*, 607 F. Supp. 2d 437, 441 (E.D.N.Y. 2009) (citation omitted). The plaintiffs in *Sparks* challenged a regulation in which psychiatric patients were required to have "supervised" visitation, resulting in the possibility that a guard would overhear personal matters or concerns about medical treatment or about general conditions at the hospital. *Id.* at 439. The patients claimed only that they and their visitors had been "reluctant" to discuss various matters within earshot of a supervising guard, thus, implicating their right to discuss private matters with their family members. *Id.* at 441. The District Court granted summary judgment in

favor of defendants on the First Amendment claim.[18] *Id.* at 442.

In affirming the District Court's opinion in *Sparks*, the Second Circuit held that in order to establish a First Amendment violation, the plaintiff must "as a threshold matter show that her rights have been burdened or restricted." *Sparks v. Seltzer*, 380 F. App'x 26, 27 (2d Cir. 2010). Subjective "chill" was not an adequate substitute for objective harm. *Id.* (citations omitted). The court found that an institutional policy permitting psychiatric patient visits to be supervised on the order of an attending psychiatrist did not violate the patients' First Amendment rights. *Id.* at 27. The court stated that "where the mere possibility of being overheard by a state actor who is not conducting an investigation, but instead is merely on hand to respond in the event of an emergency does not constitute objective harm." *Id.* at 27-28.

## 2. Application

Defendant Carbery has filed an affidavit in support of the defendants' motion for summary judgment. (Carbery Aff.) (Dkt. No. 36-5). His affidavit outlines the OCJC policies and procedures relative to the evaluation of inmates coming into the facility, their referral to the BHU, and the conditions of 1-1 supervision. (*Id.*) Defendant Carbery states that when an individual is arrested and brought to the OCJC, part of the admissions process includes completing a "suicide prevention assessment" and asking

---

[18] The District Court also granted summary judgment on a "zone of privacy" claim under the Fourth Amendment. 607 F. Supp. 2d at 442-43. The court notes that the patients in *Sparks* were not convicted inmates or pretrial detainees, and the court declined to apply either strict scrutiny or the standard for restrictions on prisoner's speech. *Id.* at 442. If no constitutional violation occurred in a case in which the plaintiff was not an inmate, there would be no constitutional violation in a similar situation in which the plaintiff was a pretrial detainee.

the detainee if he or she took any street drugs prior to the arrest. (Carbery Aff. ¶ 9).

The detainee's responses are documented on a Booking Process Checklist. (*Id.* & Ex.

A).  If the individual is under the influence of drugs and/or alcohol and has diagnosed

or undiagnosed mental illnesses, his/her behavior may be erratic, and the potential for

self-harm may be heightened. (Carbery Aff. ¶ 12).  Deputies, medical staff, and mental

health staff all receive training to assist them in recognizing inmates who may present a

suicide risk. (*Id.*)  All inmates are screened for this potential, and based upon this

evaluation, the medical and mental health personnel take the appropriate actions or

precautions "for the safety and well-being of the inmate." (*Id.*)

At the time of plaintiff's booking in July of 2011, the OCJC contracted with

Correctional Medical Care, Inc. ("CMC") to provide medical and mental services to the

OCJC inmates. (Carbery Aff. ¶ 13).  Plaintiff's medical and mental assessments were

completed by CMC employees, pursuant to CMC policies. (*Id.*)  The Onondaga County

Sheriff's Department had a written directive entitled "Mental Health Services." (*Id.* &

Ex. G).  This written directive defines the levels of supervision. (Dkt. No. 36-13 at 3). It

also describes the OCJC 'Suicide Prevention Program," which lists determining criteria

and discusses how and to whom information is reported; how often inmates are

monitored; how records are kept; and discusses how supervision status may be

changed. (*Id.* at 4-8).  This directive also discusses "Suicide Prevention Smocks,"

including criteria for the issuance of smocks and the factors considered in determining

whether to discontinue their use. (*Id.* at 7).

As stated above, the court finds that plaintiff's placement in 1-1 supervision was

justified based on the records showing that he was under the influence of drugs and alcohol upon admission to the OCJC and did make a suicidal statement. Thus, the issue becomes whether the conditions of confinement in 1-1 supervision violated plaintiff's constitutional rights, and if so, whether that violation could be attributed to a "policy or custom" of the defendant County.

Plaintiff claims that the conditions were "extreme" and that the defendants could have accomplished their goal by "far less degrading [and] restrictive means." (Dkt. No. 51 at 19). Defendant LaMere indicated that the 1-1 supervision would be with "no sheets, no sharps, and safety attire." (Carbery Aff. ¶ 21 & Ex. A at 15). "Safety attire" consists of a smock, made of thick fabric that does not tear easily so that the inmate may not hang or otherwise injure himself by using torn fabric. (Carbery Aff. ¶ 22). Plaintiff was also placed in a "stripped" cell in which all personal items are removed, and the inmate is not permitted to have pens, pencils or soap. (*Id.*) Defendant Carbery states that inmates placed on 1-1 supervision "are given a mattress with the pillow rolled into one end of the mattress," and the entire unit is covered in plastic. (Carbery Aff. ¶ 23). Defendant Carbury states that the OCJC also has a mattress/blanket combination, which resembles a sleeping bag, that is given to some inmates. Showers are offered every other day, unless the deputy believes that it is too dangerous to remove the inmate from the cell. Inmates are not allowed telephone calls "due to potential exacerbation of mental instability/emotional disturbance." (*Id.*)

Although plaintiff claims that he never received a mattress or pillow, and his "safety attire" was too small, he concedes that on July 19, 2011, "deputy R. Folsom . . .

removed the smaller smock initially provided to him on 7/16/11 & exchanged it with a larger (slightly more padded) type of smock, because his genitals & rump were completely exposed, while he had been laying down." (Pl.'s Stmt. of Mat. Facts ¶ 25). The contemporaneous notes by Dep. Fulsom show that on July 19, 2011, "cell # 9 [plaintiff was] given safety mattress/blanket combo, removed single blanket." (Carbery Aff. Ex. A pt.2 at 25). While plaintiff complains about excessive cold, he was only confined without his own clothes for five days in *July* of 2011. It seems unlikely that the entire BHU was kept at such an incredibly cold temperature. In any event, where an inmate has not been subjected to "bitter cold" for a "prolonged" period, his claims fall short of constitutional violations. *See Tyler v. Argo*, No. 14-CV-2049, 2014 WL 5374248, at *7 (S.D.N.Y. Oct. 10, 2014) (quoting *Trammell v. Keane*, 338 F.3d 156, 164 (2d Cir. 2003)). *Cf. Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (denying summary judgment where the inmate was exposed to freezing temperatures for months, to the point where water froze in his toilet); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (plaintiff was subjected to near or well below freezing for five months). Plaintiff's claim in this case, that he was cold for five days in July, does not even approach a constitutional claim, notwithstanding his allegation that even the guards were wearing sweaters on the unit.

It is also clear that plaintiff was given additional attire (or his attire was changed) on July 19. Plaintiff was not admitted to the unit until very late on July 16th. Thus, the time that he could have spent "exposed" was quite short: between July 17th and July 19th, when he alleges he was given a larger smock, and July 21st when his clothes were

32

returned to him. Plaintiff alleges no risk to his safety based upon the allegedly cold temperatures, and although he claims that his hips bothered him due to the metal slab upon which he had to sleep, there is ***no indication*** that this exposure for a short period of time created an excessive risk to plaintiff's health or safety, sufficient to rise to the level of an Eighth Amendment violation.

Inmates on 1-1 supervision are monitored, and notations are entered into the log book every 15 minutes. (*See* Carbery Aff. Ex. A at 2-38). Most of the notes indicate that plaintiff McMillian was "doing OK," "appeared to be sleeping," or sitting/laying on his bunk. (*Id.*) For example, on July 21, at 15:58, plaintiff was "taken to court," and he returned at 17:29. (*Id.* at 34). At that time, plaintiff was given his meal tray and drink, and he sat on his bunk eating. (*Id.*) At 18:52, defendant LaMere was speaking to plaintiff in his cell. (*Id.* at 35). At 21:00, plaintiff took his medications, and went to sleep. (*Id.* at 35-37). By 11:30 on July 22, 2011, plaintiff's status had been reduced to "frequent check." (*Id.* at 38).

Defendant Carbery states that inmates on 1-1 supervision may have visits from attorneys and clergy, but in order to maintain security, such visits will occur at the inmate's cell, unless the visitor requests privacy during the visit. (Carbery Aff. ¶ 24). When an attorney requests private communication with the inmate, arrangements will be made. Plaintiff had a visit from his attorney on July 19, 2011, and as stated above, plaintiff was taken to court on July 21, 2011. Plaintiff had ample opportunity to discuss his status with his attorney, and his attorney was clearly aware of the conditions of plaintiff's confinement on July 19, 2011 when he visited plaintiff on the unit. Visits

33

with health care providers also occur at the cell unless the provider requests that other arrangements be made. (*Id.*)

Defendant Carbery also states that although inmates on 1-1 supervision that have been designated "no sharps," are not allowed pens or pencils to write grievances, they may request help in filing a grievance from the supervising deputy (who is there 24/7); the Sergeant (who visits twice per shift); the Lieutenant (who visits once per shift); the Programs Deputy (who visits once per shift); the inmate's attorney, the Jail Ministry; or even another inmate. (Carbery Aff. ¶ 27). Defendants state that showers are offered every other day, and although plaintiff states that he only had one shower during the time that he was on 1-1 supervision, one shower in six days does not rise to the level of a constitutional violation. *See Dillon v. City of New York*, No. 12 Civ. 6746, 2013 WL 3776252, at *5-6 (S.D.N.Y. July 18, 2013) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (two-week suspension of shower privileges does not suffice as a denial of "basic human needs)).

Plaintiff claims that he did not make statements of self harm. However, the contemporaneous records contradict his statement and make it clear that plaintiff admitted to an individual who is not a defendant in this action that plaintiff was "coming off" of drugs and alcohol when he made his statements. Regardless of plaintiff's reasons for making the statements, defendants reasonably placed plaintiff on 1-1 supervision for his own safety. The extra observation and the deprivation of materials that could have been used to commit suicide was necessary to ensure that plaintiff did not carry through with any self harm.

34

Plaintiff also alleges that the defendant kept him on 1-1 supervision even after a psychiatrist stated that plaintiff should be released from such strict supervision on July 18, 2011, and despite "daily" documented reports that he no longer had any suicidal ideation. (Pl.'s Stmt. of Mat. Facts ¶ 14). The contemporaneous records show that at 21:20 (9:20 p.m.) on July 18, 2011, a psychiatrist visited plaintiff and recommended "D/C [discontinue] 1:1," in addition to prescribing medication. (Dkt. No. 37 at 28). However, when plaintiff was seen the next day at 9:30 a.m. for an assessment and "f/u [follow up] for 1:1," he "refused to respond." (*Id.*) Instead, plaintiff "did raise his head, look at this writer and lie [sic] back down." The notation further states "[inmate] not reduced due to inability to assess." (*Id.*) Thus, although the psychiatrist recommended that 1-1 be discontinued, plaintiff refused to be assessed the next morning, and the social worker did not change plaintiff's status because of his own behavior.

In plaintiff's response to defendants' motion, he admits that "following qualified recommendations by a licensed psychiatrist, to discontinue the Plaintiff's One on One observation, the Plaintiff had been continued on the One on One, because he had refused to speak to a particular Social Worker that would have required him to discuss confidential issues through his cell door in front of everyone on the unit."[19] (Pl.'s Stmt. of Mat. Facts ¶ 13). Plaintiff acknowledges that he knows why the psychiatrist's recommendation was not followed. However, plaintiff's own behavior, not the defendant's actions or the OCJC policy kept him from being released from 1-1

---

[19] It appears that the "social worker" to whom plaintiff is referring may have been defendant LaMere. The signature on the medical record is not legible, but it appears to be similar to the signature, known to be defendant LaMere's.

supervision.

With respect to his right to bodily privacy, plaintiff claims that the position of the observation cells on the unit was such that other individuals could see him while he was performing all activities, including using the toilet. The visible position of the cell is related to the purpose of 1-1 supervision.[20] If an inmate is suicidal, the facility staff has the responsibility to observe the inmate at all times so that he will not harm himself. This clearly affects an inmate's privacy interests, but only to the extent reasonably necessary to prevent harm to himself.

Plaintiff does not claim that the individuals who were assigned to the 1-1 supervision were of the opposite sex. He merely states that due to the position of the cell and his allegedly inadequate body covering, there were times when he may have been seem by guards who were female or by "visitors." Plaintiff makes no specific references to how many times this could have occurred, and based upon his very short stay in 1-1 observation, he has not shown continuous or even "regular" viewing. Thus, plaintiff's bodily privacy claims may be dismissed.

Plaintiff has also failed to establish that his privacy rights were violated because other inmates and staff could have overheard some discussion that plaintiff may have

---

[20] 1-1 supervision is also known as "Constant Supervision," the procedures for which are listed in 9 NYCRR § 7003.2(d). This term "shall mean the uninterrupted personal visual observation of prisoners by facility staff responsible for the care and custody of such prisoners . . . . Facility staff shall provide continuous and direct supervision by permanently occupying an established post in close proximity to the prisoners under supervision which shall provide staff with: (1) continuous clear view of all prisoners under supervision; and (2) the ability to immediately and directly intervene in response to situations or behavior observed which threaten the health or safety of prisoners or the good order of the facility." *Id.*

had with mental health personnel or with his attorney, who visited him once during his 1-1 observation. Plaintiff has not made any allegation of harm resulting from such a policy.[21]

Plaintiff cites *Houston v. Cotter*, 7 F. Supp. 3d 283 (E.D.N.Y. 2014) for the proposition that there are genuine issues of material fact regarding the conditions of 1-1 supervision. In *Houston*, however, the plaintiff was alleging a due process violation in connection with his placement on suicide watch. *Id.* at 287-90. The conditions that the plaintiff in *Houston* was subjected to were considered for purposes of whether a liberty interest existed under *Sandin v. Conner*, 515 U.S. 472 (1995), not for whether the conditions violated substantive due process or the Eighth Amendment.

*Houston* is distinguishable from this case because in *Houston*, plaintiff was challenging a potential municipal policy whereby inmates could be kept on suicide watch as punishment, "with no meaningful oversight."[22] 7 F. Supp. 3d at 286. In *Houston*, **any employee** could place an inmate on suicide watch. *Id.* at 287. In this case, the level of suicide precautions "will be ordered based upon the assessment of a health care professional," and only mental health care professionals can remove plaintiff from that status. (Carbery Aff. ¶ 16 & Ex. G). This court has found that plaintiff's placement

---

[21] As stated above, defendants claim that although an inmate is not automatically moved when his attorney or medical provider visits him, he will be moved to a more private area if it is requested by the visitor. Even if the court does not accept this statement, plaintiff has failed to show a constitutional violation resulting from the defendants' alleged policy.

[22] Plaintiff in *Houston* "does not question that 'segregation on a justified suicide watch' is 'within the range of confinement normally expected by a prisoner,' or that prison officials should be 'encouraged to attend to mental health considerations rather than being penalized for having done so.'" 7 F. Supp. 3d at 297 (citing *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 373 (E.D.N.Y. 2005)).

on suicide watch was justified.  Thus, plaintiff's claim that the conditions of

defendants' 1-1 constant supervision policy/procedures were unconstitutional may be

dismissed.

## VI.  **Medical Care**

### A.    **Legal Standards**

In order to state a claim for cruel and unusual punishment under the Eighth

Amendment, based on constitutionally inadequate medical treatment, a sentenced

prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316

F.3d 178, 183–84 (2d Cir. 2003).  The first element is objective and measures the

severity of the deprivation, while the second element is subjective and ensures that the

defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing, *inter alia*,

*Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

Constitutional medical care claims by pretrial detainees must be analyzed under

the Due Process Clause of the Fourteenth Amendment because the Eighth

Amendment's cruel and unusual "punishment" clause is not directly applicable to

prisoners who have not been convicted.  *Mayo v. County of Albany*, 357 F. App'x 339,

341 (2d Cir. 2009).  In 2009, the Second Circuit held that the Eighth Amendment

"deliberate indifference" standard, as articulated in the Supreme Court's decision in

*Farmer v. Brennan*, 511 U.S. 825 (1994), should be applied to constitutional medical

care claims of pretrial detainees under the Due Process clause.  *Caiozzo v. Koreman*,

581 F.3d 63, 66, 72 (2d Cir. 2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment").

The objective prong of the deliberate indifference standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id*. at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange*, 248 F. App'x at 236 (citing, *inter alia*, *Chance v. Armstrong*, 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that

39

risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id*. at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord*, 467 F.3d at 281.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly*, 784 F. Supp. 35,

44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (table).

### B.     Application

Plaintiff alleges that because he was forced to go barefoot, he got a piece of "pencil lead" stuck in his big toe which became infected.  To the extent that plaintiff is alleging a denial of proper medical care, this claim is not related to any county policy and there is no evidence that defendant Carbery would have been aware of plaintiff's injury.  Thus, the claim would have to be dismissed as against both defendants.  To the extent the court could consider the merits as a "medical care" claim, it would have to be dismissed in any event.

The plaintiff's medical records state that on July 21, a nurse was called to the pod to examine a "sliver" in plaintiff's right great toe. (Dkt. No. 37 at 26).  The nurse, who was never a defendant in this action, states in a progress note that plaintiff told her that the sliver had been there for "a couple of days" without signs of infection. (*Id.*) Plaintiff was scheduled to see the doctor, who removed the "foreign body" the next day and prescribed an antibiotic. (*Id.*)  A sliver in one's big toe is not a "sufficiently serious" condition, and there is absolutely no claim of deliberate indifference.  The nurse was called at 14:28 (2:28 p.m.) on July 21, and the sliver was removed by the doctor at 10:30 a.m. on July 22, 2011.  There is absolutely no evidence of deliberate indifference to his injury.

Plaintiff also alleges that his hips were bruised and he had back problems as the result of sleeping on the bare metal bed.  Although he alleges that this condition "went untreated" for three weeks, he was only on 1-1 supervision for six days, and when the

nurse came to examine plaintiff for his "sliver," (the day before he was placed on frequent check), plaintiff apparently did not mention that his hips or his back was bothering him. On July 30, 2011, plaintiff submitted a "sick call request," stating that he had not seen anyone about his hip/lower back pain, caused by sleeping on the metal bed. (Dkt. No. 37 at 39). On August 1, 2011, plaintiff was examined by the doctor regarding his complaints. (Dkt. No. 37 at 22). The doctor prescribed ibuprofen. (*Id.*) There is no indication of either a "sufficiently serious" condition or of deliberate indifference from the medical staff. Thus, to the extent that plaintiff's statements may be construed as a medical care claim, any such claim may be dismissed. First, there are no appropriate defendants for such a claim, and second, the claim has no constitutional merit.[23]

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motions for a "continuance" pursuant to Fed. R. Civ. P. 56(d) and for sanctions (Dkt. No. 51) are **DENIED**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 36) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY AS AGAINST THE REMAINING DEFENDANTS**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such

---

[23] The court notes that these allegations may not be a separate medical care claim, although defendants have interpreted them as such. Plaintiff may be attempting to show that his confinement on 1-1 supervision caused him "injuries" for purposes of 42 U.S.C. § 1997e(e) which requires plaintiff to show physical injury prior to recovering on a section 1983 claim.

42

objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: February 19, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge